## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ X

NOELLE CROOKS,                                  :

                    Plaintiff,                 :

                    v.                         :    Case No. 1:25-cv-5899

                                      :

MAXWELL SOCIAL CLUB TRIBECA INC.,               :    COMPLAINT
d/b/a MAXWELL SOCIAL,
DAVID LITWAK, and                               :
KYLE CHANING-PEARCE,                            :
in their individual and professional capacities,

                                      :

                                      :    **Jury Trial Demanded**

                  Defendants.                :

------------------------------------------------------------------------ X

Plaintiff Noelle Crooks hereby alleges against Defendants Maxwell Social Club Tribeca Inc. ("Maxwell Social"), David Litwak, and Kyle Chaning-Pearce, in their individual and professional capacities (together, "Defendants"), as follows:

**I.    Introduction**

1.    Maxwell Social publicly markets itself as breaking down "barriers between higher-status people and lower-status people." But behind closed doors, Maxwell Social operates as a toxic boys' club where founders David Litwak and Kyle Chaning-Pearce systematically exploit employees and engage in discriminatory and illegal behavior.

2.    For example, when Plaintiff Noelle Crooks requested basic accommodations to manage her autoimmune disease, Mr. Litwak callously told her that if he had known about her health condition during hiring, he "would have tried to scare [her] more" and "would have been more resentful earlier" —shocking admissions that Mr. Litwak would have engaged in deliberate discrimination during the hiring process had he known about her disability.

3.      As another example, when Ms. Crooks mentioned that she had family obligations, Mr. Litwak told her to "tell [her] family to fuck off."

4.      This wasn't just Mr. Litwak being rude at work; it is Defendants' calculated business model. Mr. Litwak openly brags about preferring to hire "22-23 year olds because they have the energy and don't require boundaries"—a deliberate strategy to exploit young workers who don't know their rights. In fact, he publicly rejects work-life balance as a "myth" and has written that employees should expect to work 60-80 hours per week (without overtime pay).

5.      Despite Maxwell Social's public commitment to diversity, Defendants routinely make derogatory comments about prospective members based on race and sexual orientation, referring to them as "that black guy," "the Indian chick," or "the gay one." When Ms. Crooks offered membership to a Black queer woman, Defendants immediately revoked her membership approval authority as retaliation. Such conduct is part of Defendants' pattern of disregarding the rights of individuals to be free from discrimination.  In this case, this pattern of conduct ultimately targeted Ms. Crooks.

6.      Defendants hired Ms. Crooks as "Chief Membership Officer." While this title was designed to circumvent overtime laws, Defendants relegated her to menial customer service tasks while maintaining full control over all material decisions. This classic misclassification scheme allowed them to extract 60-80 hour work weeks without paying overtime.

7.      Defendants' violations of basic employment law are systematic and willful. After initially paying Ms. Crooks bi-weekly in compliance with New York Labor Law § 191, they unilaterally switched her to illegal monthly payments. They refused to pay overtime despite her non-exempt status and excessive hours. They treated basic employment documentation requirements as "inconveniences."

8.      When Ms. Crooks's autoimmune condition flared due to the extreme stress of working under these conditions, she requested reasonable accommodations. Rather than engaging in the required cooperative dialogue, Mr. Chaning-Pearce responded: "It sounds like you want us to act with more decency." He then told Ms. Crooks that "startups are like war, and if you're not prepared for that, then it might not be a good fit."

9.      The final blow came during a June 2024 video conference where Mr. Litwak launched a vicious personal attack on Ms. Crooks's character and disability. He accused her of "cheating" on a metaphorical medical examination because of her health condition, admitted he would have been "more resentful earlier" had he known about her disability, and demanded she prioritize the company over her family's wellbeing. He had also disclosed her private health information to other employees, calling her a "bait and switch."

10.     Faced with this relentless harassment, discrimination, and retaliation, Ms. Crooks had no choice but to resign. Defendants then tried to cover their tracks by asking Ms. Crooks to sign a release of her claims.  Ms. Crooks refused, and she now seeks to fully remedy the litany of legal violations she suffered at the hands of Defendants.

## II.    Administrative Procedures

11.      Pursuant to N.Y.C. Admin. Code § 8-502(a), Ms. Crooks elects to pursue her claims under the New York City Human Rights Law through this civil action rather than through administrative proceedings before the New York City Commission on Human Rights.

12.     In accordance with N.Y.C. Admin. Code § 8-502(b), Ms. Crooks has mailed or will mail a copy of this complaint to the New York City Commission on Human Rights within thirty (30) days of filing this action.

### III.    Jurisdiction and Venue

13.    The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as this action involves federal questions about violations of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. This Court has supplemental subject-matter jurisdiction over Ms. Crooks's related state and local law claims pursuant to 28 U.S.C. § 1367(a).

14.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred there. Maxwell Social has business operations located in this District, and Ms. Crooks's employment and performance occurred in this District.

### IV.    Parties

15.    Plaintiff Noelle Crooks is a published author and respected community builder who resides in New York. At all relevant times, Ms. Crooks met the definition of "qualified individual," "employee," and/or "eligible employee" under all applicable federal, state, and local statutes. Ms. Crooks is an individual with a disability under the New York State Human Rights Law and the New York City Human Rights Law.

16.    Defendant Maxwell Social Club Tribeca, Inc. is a private members club operating in New York, New York. At all relevant times, Defendant met the definition of an "employer" and/or a "covered employer" under all relevant federal, state, and local statutes, including, but not limited to, the Fair Labor Standards Act, the New York State Human Rights Law, the New York City Human Rights Law, and New York Labor Law.

17.    Defendant David Litwak is co-founder and controlling owner of Maxwell Social. At all relevant times, he acted as Ms. Crooks's supervisor and had authority over her terms and conditions of employment. He is sued in his individual and professional capacity.

18.    Defendant Kyle Chaning-Pearce is co-founder and controlling owner of Maxwell Social. At all relevant times, he acted as Ms. Crooks's supervisor and had authority over her terms and conditions of employment. He is sued in his individual and professional capacity.

## V.    Factual Background

### A.    David Litwak and Kyle Chaning-Pearce start Maxwell Social.

19.    After meeting in college, David Litwak and Kyle Chaning-Pearce founded Maxwell Social Club in 2009.

20.    Maxwell Social positions itself as a "second home" for its members. The Club's marketing emphasizes breaking down "barriers between higher-status people and lower-status people" through communal experiences, where members cook together in a "grand kitchen" with copper pots and pans and mix their own drinks.

21.    In reality, Maxwell Social functioned like a "glorified frat house":  a chaotic, founder-led party club composed primarily of white men from the tech and VC world, where Defendants treated legal compliance as an inconvenience and systematically treated women as second-class participants.

22.    Mr. Litwak served as the public face and primary decision-maker, while Mr. Chaning-Pearce handled much of the communication. Their leadership style was erratic, disorganized, and hostile, with complete disregard for employee rights and workplace laws.

23.    Defendants fostered an environment where discriminatory comments were commonplace, and they openly mocked employees' protected characteristics and used them against employees.

24.    Similarly, Defendants frequently failed to maintain required employment documentation and systematically violated wage and hour laws as standard business practice.

**B.**     **Defendants hire Ms. Crooks as Chief Membership Officer.**

25.     Plaintiff Noelle Crooks is a published author and respected community builder with connections and a strong track record in NYC's cultural scene.

26.     Ms. Crooks discovered Maxwell Social online while researching startups in the membership and community space. Having built a career working at startups and acting as a right hand to founders in early-stage growth and community strategy, she was open to learning about opportunities with Maxwell Social.

27.     Ms. Crooks reached out to express interest. After a few initial conversations, she met with Mr. Litwak for a formal interview on January 4, 2024.

28.     On January 18, 2024, Maxwell Social offered Ms. Crooks employment with the title of Chief Membership Officer. She was presented with an annual salary of $130,000 plus health insurance benefits. Defendants gave Ms. Crooks only 24 hours to accept the offer.

29.     Ms. Crooks accepted and was scheduled to start February 1, 2024. Despite the agreed-upon start date, Mr. Litwak immediately began sending Ms. Crooks work and pressured her to leave her pre-paid family vacation to start early.

30.     Feeling pressured by Mr. Litwak and wanting to make a good impression, she cut her trip short.

**C.**     **Maxwell Social exploits its employees by failing to pay employees properly and by creating harsh working conditions.**

31.     Shortly after Ms. Crooks began working at Maxwell Social in late January 2024, Defendants unilaterally switched Ms. Crooks's payment structure from bi-weekly payments to monthly payments. Bi-weekly payments are legal, and monthly payments are illegal, meaning that Defendants' actions deprived Ms. Crooks of wages she was legally entitled to receive.

32.    Despite the impressive "Chief Membership Officer" title, Defendants assigned Ms. Crooks job duties that bore no resemblance to executive work and did not qualify her as exempt from overtime requirements. Her day-to-day responsibilities were entirely non-exempt and consisted primarily of the following:  responding to routine member inquiries and complaints in standard customer service capacity; performing basic administrative tasks such as data entry, scheduling events, and record-keeping; reporting to owners and obtaining their approval for even minor customer service issues; being completely subject to owners' control, direction, and micromanagement; requiring express approval before offering membership to prospects; performing no supervisory duties; having no authority to assign work to others or make staffing decisions; and having no meaningful input into business strategy, policy, or operations.

33.    Defendants maintained control over all managerial functions through a rigid top-down structure where employees, including Ms. Crooks despite her executive title, served completely at Defendant Litwak and Defendant Chaning-Pearce's whims. Ms. Crooks had no independent decision-making authority and ultimately required approval for even routine membership and customer service decisions. Defendants exercised complete discretion over every meaningful aspect of business operations and any theoretical discretion Ms. Crooks had was ultimately curtailed by Defendants.

34.    Indeed, Mr. Litwak has admitted in writing that most customer service and branding work entails non-managerial and non-exempt duties. In a blog post titled "Iceberg Theory of Employment," Mr. Litwak writes:

> I've noticed that for many jobs at Maxwell there is what people THINK a position entails and **what it ACTUALLY entails**.

Membership relations may seem like speaking to and cultivating relationships with members, **but in actuality 90% of the job is living in the spreadsheets, planning dinners, nagging people to show up, etc.**

Brand partnerships may seem like coming up with cool activations with trendy brands, but in **actuality 90% of the job is cold calling & emailing to make sure you have the event properly sponsored.**

When we hire I ask myself what the 90% is and I remind myself of those qualities every time we speak to someone. It's easy to get distracted by the 10% because the 10% is the most visible!

But the 10% is often a nice to have instead of a need to have – I'd take an uncreative brand partnerships director (I'm chock full of fun ideas already) and even an antisocial membership director (we're mainly interested in the members meeting EACH OTHER, not one of our employees!) if they got the 90% right.

(emphasis added).

35.    Despite Ms. Crooks's non-exempt status and non-managerial duties, Defendants regularly required her to work 60 to 80 hours per week without paying overtime compensation. This included full workdays plus mandatory on-site presence at 2 to 4 club events each week, often until 11 p.m. or later.

36.    Defendants willfully and deliberately failed to pay overtime, as they explicitly rejected work-life balance and intentionally structured work requirements to exceed 40 hours per week while refusing to provide appropriate compensation.

37.    Indeed, Defendants have openly admitted a lack of concern for employee well-being and work hours. For example, Mr. Litwak has publicly claimed that work-life balance is a "myth," and employees should be expected to work 60 to 80 hours a week.

**D.    Maxwell Social creates a toxic and discriminatory work environment.**

38.    As Ms. Crooks quickly learned, the reality of working at Maxwell Social differed drastically from what Defendants presented during the interview. The environment was

disorganized, toxic, and unprofessional, with systemic discrimination based on disability, gender, race, and sexual orientation.

39.     Despite hiring her as a supposed executive, Defendants regularly undermined, micromanaged, and subjected Ms. Crooks to hostile communication. She received late-night messages (sometimes after midnight), Defendants pressured her to be available 24/7, and they shamed her for setting boundaries or attending to personal matters.

40.     Defendants demanded 60-to-80-hour work weeks with no clarity around roles, boundaries, or support. When Ms. Crooks tried to have open conversations about culture or stress, Defendants gaslit or ignored her.

41.     The harassment began immediately. During Ms. Crooks's first weekend, Litwak sent demanding WhatsApp messages about supposed urgent club issues. When she professionally responded that she would address his requests first thing Monday morning, he imperiously demanded that the work be completed "BEFORE Monday"—establishing a pattern of 24/7 availability expectations that would define her employment.

42.     Mr. Litwak's "drop everything to work" mentality set the tone for the weeks that followed, with Ms. Crooks's phone constantly buzzing with messages from Mr. Litwak and Mr. Chaning-Pearce, regardless of the time, sometimes as late as 2:00 a.m.

**E.      Maxwell Social makes membership decisions based on race and sexual orientation.**

43.     While Maxwell Social has publicly committed to building an inclusive community beyond "tech and finance guys" to embrace artists, academics, and diverse backgrounds, Ms. Crooks noticed almost immediately that Maxwell Social's practices differed drastically from their self-described "propaganda."

44.     In discussing potential members, Mr. Litwak instructed Ms. Crooks and others to discriminate based on race, social status, and economic background. Despite public claims of wanting diversity, potential members were labeled with derogatory and demeaning labels like "that black guy," "the Indian chick," "the hot girl," or "the gay one."

45.     Ms. Crooks recalls specific instances where she was forbidden from extending membership due to trivial reasons, such as someone wearing socks deemed "socks I would wear when I was 5 years old" or because of a hat they were wearing.

46.     On one occasion, Ms. Crooks offered membership to a Black queer woman without prior approval. Upset at a Black queer woman being offered membership to Maxwell Social, Mr. Litwak immediately told Ms. Crooks that she was not permitted to extend membership to anyone without them meeting either Mr. Litwak or Mr. Chaning-Pearce first to obtain their approval.

47.     On May 2, 2024, Mr. Litwak formally revoked Ms. Crooks's membership approval privileges, writing: "Btw Kyle and I spoke and I think we want to go back to having one of us meet everyone btw. Can explain more in person. Just there is a lot of learning going on on type of person, vibe, how they are jiving, etc. and as the founders we have a lot of that in our head so yeah. can explain more in person."

48.     Later, Mr. Litwak told Ms. Crooks that her decision to approve membership to the Black queer woman directly led to his decision to revoke Ms. Crooks's approval privileges.

**F.     Ms. Crooks complains about the discriminatory culture at Maxwell Social.**

49.     On February 22, 2024, within the first month of working at Maxwell Social, Ms. Crooks raised concerns about the concerning environment to Mr. Chaning-Pearce. Ms. Crooks hoped that Mr. Chaning-Pearce could enact some change.

50.     In particular, Ms. Crooks raised concerns about the working environment and level of professionalism.

51.     When Ms. Crooks expressed her concerns about hostilities in the workplace, Mr. Chaning-Pearce replied, "It sounds like you want us to act with more decency."

52.     Mr. Chaning-Pearce admitted he also had challenges with Mr. Litwak's communication but took no action to address the issues.

**G.     Ms. Crooks requests an accommodation.**

53.     Ms. Crooks suffers from Hashimoto's disease, which is an autoimmune disease that gradually destroys the thyroid gland. She was diagnosed in 2022, but had been successfully managing the condition for years.

54.     Determined to focus on her work despite the toxic environment, Ms. Crooks still faced relentless WhatsApp messages from Mr. Litwak and Mr. Chaning-Pearce at all hours. Other employees were also feeling the strain, with some quitting due to the toxic environment.

55.     Ms. Crooks's friends outside of work noticed the toll it was taking on her, commenting that she was always tired, less cheerful, and rarely seen.

56.     During this time, Ms. Crooks's autoimmune disease began to flare up again. Her doctor confirmed that high cortisol levels due to stress were causing the symptoms and urged her to mitigate the stress in her life.

57.     In response, Ms. Crooks attempted to scale back her hours at Maxwell Social, working 45-50 hours a week but limiting her nights there to two a week and leaving around 10 p.m.

58.     On April 10, 2024, Ms. Crooks informed Mr. Chaning-Pearce about the worsening of her condition and explained that she would no longer be able to be physically

present at Maxwell Social for extended hours, requesting a reasonable accommodation for her disability.

59.    Ms. Crooks explained her health condition and resulting impact of stress to Mr. Chaning-Pearce, whose dismissive response revealed Defendants' true attitude toward employee health and safety:  "We told you that startups are like war, and if you're not prepared for that, then it might not be a good fit." Defendants' callous comparison of workplace accommodation requests to military combat shows Defendants' complete disregard for federal disability laws.

60.    Defendants failed to engage in the cooperative dialogue process required by the New York City Human Rights Law, refusing to discuss potential accommodations or alternatives that would allow Ms. Crooks to perform her job duties while managing her disability.

61.    Despite Ms. Crooks voicing the worsening of her medical condition, Mr. Chaning-Pearce and Mr. Litwak continued to harass Ms. Crooks about needing to be at the club more, demonstrating their refusal to accommodate her disability.

### H.    Ms. Crooks again complains about the culture and environment at Maxwell Social, and Defendants retaliate against her.

62.    The cycle continued, with illegal activities at the club, racist and sexist comments about potential members, and constant pressure from Mr. Litwak and Mr. Chaning-Pearce. Employees were burnt out, some sleeping in their cars, getting sick, and quitting.

63.    On June 6, 2024, Ms. Crooks spoke to Mr. Chaning-Pearce again about the culture and environment. During a two-hour conversation, Ms. Crooks urged him to consider the toxic environment he was fostering.

64.    Ms. Crooks shared that some team members were falling asleep in their cars after work due to exhaustion and that many employees were experiencing panic attacks from the toxic leadership.

65.     They spoke for two hours, and Mr. Chaning-Pearce promised to discuss it further with Mr. Litwak.

66.     Instead, Mr. Chaning-Pearce emailed Ms. Crooks on June 10, 2024, stating, "I've typed up notes from our Thursday discussion. This ended up being more detailed than I originally thought, so I included it in a separate document. David will join for tomorrow's discussion. Can't stress enough how important it is for you to be there in the space, stitching members together, and being one of our chief salespeople for membership."

67.     Rather than address any of Ms. Crooks's legitimate concerns about the toxic workplace, Chaning-Pearce weaponized her feedback against her. The Google document contained nothing about the systemic problems she had raised—instead, it was a hit list of her perceived failures and unrealistic demands, essentially gaslighting her into believing that management's toxic behavior was her personal shortcoming.

**I.      Defendants force Ms. Crooks to quit.**

68.     On June 11, 2024, Ms. Crooks had a video conference with Mr. Litwak and Mr. Chaning-Pearce.

69.     Mr. Litwak began by criticizing Ms. Crooks for not being at Maxwell Social the previous Friday night.

70.     When Ms. Crooks explained she had family in town, Mr. Litwak exploded: "Sometimes you have to tell your family to fuck off for a few hours." He continued his tirade, telling her that "the rest of the team feels let down by me" and that "he doesn't do compliment sandwiches."

71.     Mr. Litwak then launched into a series of shocking admissions that revealed the depth of his discriminatory animus. Using a twisted military metaphor about medical

examinations before war, he accused Ms. Crooks of "cheating" on a metaphorical medical examination because of her health condition. He specifically stated that if he'd known about Ms. Crooks's condition during hiring, Mr. Litwak "would have tried to scare [her] more" and admitted, "I don't think that had you told me from the beginning about the health stuff once you were employed with us, it would have helped. It might have just made me a little more resentful earlier."

72.    Mr. Litwak emphasized that he doesn't believe in work-life balance and doesn't believe the role should have any boundaries. He revealed his exploitative hiring strategy, explaining that he employs 22-23 year olds because "they have the energy and don't require boundaries."

73.    Making matters worse, Mr. Litwak had disclosed Ms. Crooks's private health information to other employees, calling her a "bait and switch," thereby violating her medical privacy and further contributing to the hostile work environment.

74.    By this point, Defendants had deliberately created working conditions so difficult, hostile, and unpleasant that any reasonable person in Ms. Crooks's position would have felt compelled to resign. These conditions included: continuous harassment about her medical condition and need for accommodation; public ridicule of her work; revocation of her membership approval authority in retaliation for complaints; open hostility from Mr. Litwak who admitted he would have been "more resentful earlier" had he known about her health condition; explicit rejection of reasonable work-life boundaries; the direct statement that she needed to "tell [her] family to fuck off" to meet workplace expectations; and systematic retaliation for her protected complaints about discrimination and the hostile work environment.

75.    Faced with this impossible situation, Ms. Crooks had no choice but to suggest that they mutually part ways.

76.    She was then asked to sign a release of claims and refused under the circumstances.

77.    Ms. Crooks's last day at Maxwell Social was June 28, 2024.

78.    On July 1, 2024, Ms. Crooks discovered she had no health coverage in Gusto despite multiple confirmations she would have insurance for July. She also noticed employment paperwork irregularities Defendants had not addressed.

79.    Defendants also incorrectly calculated Ms. Crooks's final paycheck. Maxwell Social claimed it was prorated because they marked her last day as June 28th, though they had told her it would be July 1st so she could have insurance for July.

**VI.    Causes of Action**

**COUNT I**
**Failure To Engage in Cooperative Dialogue**
**<u>(New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(15))</u>**

80.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

81.    The New York City Human Rights Law requires employers to engage in a cooperative dialogue with employees who request reasonable accommodations for disabilities.

82.    Ms. Crooks suffers from Hashimoto's disease, an autoimmune condition that substantially limits major life activities, qualifying her as an individual with a disability under the NYCHRL.

83.     On April 10, 2024, Ms. Crooks informed Defendants of her disability and requested reasonable accommodations, specifically the ability to limit her physical presence at extended evening events due to her condition.

84.     Defendants failed to engage in the required cooperative dialogue process, instead responding with hostility and refusal to consider any accommodations.

85.     Defendants' failure to engage in cooperative dialogue was willful and in bad faith.

86.     As a direct and proximate result of Defendants' violations, Ms. Crooks suffered damages including lost wages, benefits, emotional distress, and other economic and non-economic losses.

### COUNT II
### Disability Retaliation
### (New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(7))

87.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

88.     Ms. Crooks engaged in protected activity by requesting reasonable accommodations for her disability and complaining about the hostile work environment.

89.     Following her protected activity, Defendants subjected Ms. Crooks to adverse employment actions including increased harassment, public ridicule, revocation of job responsibilities, and ultimately constructive discharge.

90.     The temporal proximity between Ms. Crooks's accommodation request and the escalating harassment demonstrates a causal connection between her protected activity and the adverse actions.

91.     Defendants' retaliatory conduct was willful and malicious.

92.    As a direct and proximate result of Defendants' retaliation, Ms. Crooks suffered damages including lost wages, benefits, emotional distress, and other economic and non-economic losses.

## COUNT III
## Disability Discrimination - Constructive Discharge
## (New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(1))

93.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

94.    Ms. Crooks is an individual with a disability under the NYCHRL.

95.    Defendants subjected Ms. Crooks to discriminatory treatment based on her disability, including harassment, failure to accommodate, and creation of a hostile work environment.

96.    Defendants deliberately created working conditions so intolerable that a reasonable person in Ms. Crooks's position would have felt compelled to resign.

97.    Ms. Crooks's resignation was the direct result of Defendants' discriminatory conduct based on her disability.

98.    As a direct and proximate result of Defendants' discrimination, Ms. Crooks suffered damages including lost wages, benefits, emotional distress, and other economic and non-economic losses.

## COUNT IV
## Hostile Work Environment - Disability
## (New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(1))

99.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

100.    Ms. Crooks is a member of protected classes under the NYCHRL based on her disability status.

101.    Defendants subjected Ms. Crooks to pervasive discrimination based on her disability, creating a hostile work environment that was severe and pervasive enough to alter the terms and conditions of employment.

102.    Defendants' disability-based harassment included: continuously harassing Ms. Crooks about her medical condition and accommodation requests; publicly ridiculing her work performance and calling her a "bait and switch" to other employees because of her health condition; explicitly stating that if they had known about her disability during hiring, they would have been "more resentful earlier"; accusing her of "cheating" on a metaphorical medical examination because of her disability; and refusing to engage in any meaningful accommodation dialogue.

103.    The discriminatory conduct was unwelcome, based on Ms. Crooks's protected characteristics, and was sufficiently severe and pervasive to create an abusive working environment that ultimately forced her constructive discharge.

104.    Defendants knew or should have known of the discriminatory conduct and failed to take prompt and effective remedial action.

105.    As a direct and proximate result of Defendants' hostile work, Ms. Crooks suffered damages including lost wages, benefits, emotional distress, and other economic and non-economic losses.

**COUNT V**
**Disability Discrimination - Failure to Accommodate**
**(New York State Human Rights Law, N.Y. Exec. Law § 296(1))**

106.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

107.    Ms. Crooks is an individual with a disability under the NYSHRL.

108.    Ms. Crooks requested reasonable accommodations for her disability that would not have posed an undue hardship on Defendants.

109.    Defendants failed and refused to provide reasonable accommodations, instead subjecting Ms. Crooks to harassment and discriminatory treatment.

110.    As a direct and proximate result of Defendants' discrimination, Ms. Crooks suffered damages including lost wages, benefits, emotional distress, and other economic and non-economic losses.

## COUNT VI
### Disability Retaliation
### (New York State Human Rights Law, N.Y. Exec. Law § 296(7))

111.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

112.    Ms. Crooks engaged in protected activity by requesting accommodations and opposing discriminatory practices.

113.    Defendants subjected Ms. Crooks to adverse employment actions in retaliation for her protected activity.

114.    As a direct and proximate result of Defendants' retaliation, Ms. Crooks suffered damages including lost wages, benefits, emotional distress, and other economic and non-economic losses.

## COUNT VII
### Hostile Work Environment - Disability Discrimination
### (New York State Human Rights Law, N.Y. Exec. Law § 296(1))

115.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

116.    Ms. Crooks is a member of a protected class under the NYSHRL based on her disability status.

117.    Defendants subjected Ms. Crooks to pervasive discrimination based on her disability, creating a hostile work environment.

118.    The discriminatory conduct was severe and pervasive enough to alter the terms and conditions of employment and ultimately forced her constructive discharge.

119.    As a direct and proximate result of Defendants' hostile work environment, Ms. Crooks suffered damages including lost wages, benefits, emotional distress, and other economic and non-economic losses.

## COUNT VIII
### Constructive Discharge
### (New York State Human Rights Law, N.Y. Exec. Law § 296(1))

120.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

121.    Defendants created working conditions so intolerable that a reasonable person would have felt compelled to resign.

122.    Ms. Crooks's resignation was the direct result of Defendants' discriminatory and retaliatory conduct.

123.    As a direct and proximate result of Defendants' conduct, Ms. Crooks suffered damages including lost wages, benefits, emotional distress, and other economic and non-economic losses.

**COUNT IX**
**Federal Overtime Violations**
**(Fair Labor Standards Act, 29 U.S.C. § 207)**

124.    Plaintiff repeats and realleges each and every allegation contained in the

preceding paragraphs as if fully set forth herein.

125.    Ms. Crooks was a non-exempt employee entitled to overtime compensation under

the FLSA, 29 U.S.C. § 207.

126.    Despite being titled "Chief Membership Officer," Ms. Crooks did not qualify for

the executive exemption under 29 C.F.R. § 541.100 because: (a) her primary duty was not

management of the enterprise or a customarily recognized department, as required by 29 C.F.R.

§ 541.100(a)(1), but consisted of routine customer service tasks, data entry, and administrative

functions; (b) she did not customarily and regularly direct the work of two or more other full-

time employees, as required by 29 C.F.R. § 541.100(a)(2), having no supervisory authority; and

(c) she did not have authority to hire or fire other employees or make recommendations as to

hiring, firing, advancement, promotion or other change of status that are given particular weight,

as required by 29 C.F.R. § 541.100(a)(3), instead being required to obtain approval from

Defendants for all decisions.

127.    Ms. Crooks also did not qualify for the administrative exemption under 29 C.F.R.

§ 541.200 because: (a) her primary duty was not performance of office or non-manual work

directly related to management or general business operations, as required by 29 C.F.R. §

541.200(a)(1), but consisted of routine customer service and clerical tasks; and (b) her primary

duty did not include exercise of discretion and independent judgment with respect to matters of

significance, as required by 29 C.F.R. § 541.200(a)(2), as she was required to seek approval from

Defendants for even routine membership and customer service decisions.

128.    Under 29 C.F.R. § 541.700, an employee's job title alone is insufficient to establish exempt status, and the specific job duties and salary must meet the requirements of the regulations, which Ms. Crooks's position did not.

129.    Ms. Crooks regularly worked more than 40 hours per week, often working 60-80 hours per week.

130.    Defendants willfully failed to pay Ms. Crooks overtime compensation at one and one-half times her regular rate of pay for hours worked more than 40 hours per week, in violation of 29 U.S.C. § 207(a)(1).

131.    Defendants' violations were willful, entitling Ms. Crooks to liquidated damages under 29 U.S.C. § 216(b).

132.    As a direct and proximate result of Defendants' violations, Ms. Crooks is entitled to unpaid overtime wages, liquidated damages, and attorney's fees under 29 U.S.C. § 216(b).

**COUNT X**
**State Overtime Violations**
**(New York Labor Law § 190)**

133.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

134.    Ms. Crooks was a non-exempt employee entitled to overtime compensation under New York Labor Law.

135.    Ms. Crooks regularly worked more than 40 hours per week without receiving proper overtime compensation.

136.    Defendants' violations were willful and in bad faith.

137.    As a direct and proximate result of Defendants' violations, Ms. Crooks is entitled to unpaid overtime wages, liquidated damages, and attorney's fees.

## COUNT XI
## Wage Payment Violations
## (New York Labor Law § 191)

138.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

139.    New York Labor Law § 191 requires employers to pay employees at least semi-monthly.

140.    After paying Ms. Crooks biweekly in compliance with the law, Defendants unilaterally switched to monthly payments in willful violation of N.Y. Lab. Law § 191.

141.    Defendants' violation of the statutory payment schedule deprived Ms. Crooks of timely receipt of wages to which she was legally entitled.

142.    Under N.Y. Lab. Law § 198, Ms. Crooks is entitled to mandatory double liquidated damages.

143.    As a direct and proximate result of Defendants' violations, Ms. Crooks is entitled to liquidated damages and attorney's fees.

## COUNT XII
## Aiding and Abetting Discrimination
## (New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(6))

144.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

145.    The New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(6), makes it unlawful for any person to aid, abet, incite, compel or coerce the doing of any act forbidden by the law or to attempt to do so.

146.    Defendants David Litwak and Kyle Chaning-Pearce, in their individual capacities, aided and abetted discrimination against Ms. Crooks based on her disability by: (a) actively

participating in harassment and hostile treatment because of her protected characteristics; (b) refusing to engage in cooperative dialogue regarding reasonable accommodations; (c) retaliating against Ms. Crooks for requesting accommodations and opposing discriminatory practices; (d) creating and maintaining a work environment hostile to individuals with disabilities; and (e) constructively discharging Ms. Crooks because of her protected characteristics.

147.    Defendants Litwak and Chaning-Pearce had actual knowledge of the discriminatory conduct and actively participated in, facilitated, and encouraged such conduct.

148.    As a direct and proximate result of Defendants' aiding and abetting conduct, Ms. Crooks suffered damages including lost wages, benefits, emotional distress, and other economic and non-economic losses.

### COUNT XIII
### Aiding and Abetting Discrimination
### <u>(New York State Human Rights Law, N.Y. Exec. Law § 296(6))</u>

149.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

150.    The New York State Human Rights Law, N.Y. Exec. Law § 296(6), makes it unlawful for any person to aid, abet, incite, compel or coerce the doing of any act declared unlawful by the law or to attempt to do so.

151.    Defendants David Litwak and Kyle Chaning-Pearce, in their individual capacities, aided and abetted discrimination against Ms. Crooks based on her disability by: (a) actively participating in harassment and hostile treatment because of her protected characteristics; (b) refusing to provide reasonable accommodations for her disability; (c) retaliating against Ms. Crooks for requesting accommodations and opposing discriminatory practices; (d) creating and

maintaining a work environment hostile to individuals with disabilities; and (e) constructively discharging Ms. Crooks because of her protected characteristics.

152.    Defendants Litwak and Chaning-Pearce had actual knowledge of the discriminatory conduct and actively participated in, facilitated, and encouraged such conduct.

153.    As a direct and proximate result of Defendants' aiding and abetting conduct, Ms. Crooks suffered damages including lost wages, benefits, emotional distress, and other economic and non-economic losses.

## VII.    Prayer For Relief

WHEREFORE, Plaintiff respectfully requests that this Court:

A.    Enter judgment for Plaintiff and against Defendants on all causes of action;

B.    Award Plaintiff compensatory damages in an amount to be determined at trial;

C.    Award Plaintiff punitive damages where permitted by law;

D.    Award Plaintiff liquidated damages under federal and state wage and hour laws;

E.    Award Plaintiff unpaid overtime wages with interest;

F.    Award Plaintiff reasonable attorney's fees and costs;

G.    Grant such other and further relief as this Court deems just and proper.

## VIII.    Jury Demand

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:    July 18, 2025
      New York, New York        Respectfully submitted,

*/s/ Zachary L. Rubin*
**ZLR Litigation, PLLC**
680 E Main Street, Suite A #638
Stamford, CT 06901
      *and*

4 International Drive, 1st Floor
Rye Brook, NY 10573
(203) 212-9983
zach@ZLRlitigation.com

**SHAH LITIGATION, PLLC**
Vishal H. Shah*
867 Boylston Street
5th Floor, No. 1893
Boston, Massachusetts 02116
Telephone: (617) 334-5825
vishal@shahlitigation.com

* pro hac vice admission to be sought

*Attorneys for Plaintiff Noelle Crooks*